# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 95
In the Matter of John Borelli, et al.,
     Appellants,
   v.
City of Yonkers,
     Respondent.

Richard S. Corenthal, for appellants.
Paul J. Sweeney, for respondent.

WILSON, J.:

This case arises out of a dispute between the City of Yonkers (Yonkers) and 39 of its firefighters, who are permanently disabled and retired as a result of work-related injuries (the Retirees). The parties dispute whether certain compensation outlined in their collective bargaining agreements (CBAs) constitutes "regular salary or wages" for the purposes of calculating the Retirees' General Municipal Law § 207-a (2) supplement. We conclude, consistent with our precedent, that "regular salary or wages" within the meaning of section 207-a (2) includes monetary compensation to which current firefighters are contractually entitled based on the performance of their regular job duties. It does not,

- 1 -

however, include monetary compensation based on the performance of additional responsibilities beyond their regular job duties. We thus conclude here that holiday pay and check-in pay should be included in the supplement, while night differential should not.

General Municipal Law § 207-a (2) provides that, for firefighters who are permanently disabled due to work-related injuries and receiving certain benefits from the state, a municipality must make up the difference between those benefits and the firefighter's "regular salary or wages" until the firefighter reaches the mandatory retirement age. Since at least 1995, the CBAs have provided for holiday pay, check-in pay, and night differential, which collectively the parties refer to as "special pays."[1] Until 2015, Yonkers included all three of these payments when calculating the Retirees' section 207-a (2) supplements.

On December 9, 2015, Yonkers sent a letter to the Retirees stating that the prior practice of including these payments had been a mistake and that it planned to remove such "special pays and other compensation" from the calculation of each Retiree's section 207-a (2) supplement effective January 14, 2016.[2] The Retirees initially challenged this

---

[1] One CBA is with Yonkers Fire Fighters, Local 628, IAFF, AFL-CIO (Local 628) (the union representing employees holding the title of "Fire Fighter") and the other is with Uniformed Fire Officers Association of the City of Yonkers (the union representing fire officers). This opinion collectively refers to the employees covered by both CBAs as "firefighters."

[2] The instant dispute pertains only to the Retirees, who all retired due to permanent disability before December 9, 2015. In a separate dispute concerning Local 628 members who became or will become permanently disabled on or after December 9, 2015, an arbitrator ruled that Article 31 of the Local 628 CBA did not permit Yonkers to remove the holiday pay, check-in pay, and night differential from the calculation of those members'

decision through administrative hearing procedures. After the hearing process concluded in Yonkers's favor, it sent each Retiree a "final determination" adjusting the Retiree's benefits. The Retirees filed a CPLR article 78 proceeding against Yonkers, challenging its decision to cease special pays and recoup already-made payments as arbitrary and capricious, an abuse of discretion, and unsupported by substantial evidence. Supreme Court granted the Retirees' request to block Yonkers from recouping past payments, but otherwise denied the petition.[3] The Appellate Division affirmed (187 AD3d 897 [2020]). We granted the Retirees leave to appeal (36 NY3d 911 [2021]).

## I.

There are two distinct bases for including compensation in the calculation of a permanently disabled firefighter's section 207-a (2) supplement (*see Matter of Chalachan v City of Binghamton*, 55 NY2d 989, 990 [1982]). First, all compensation constituting a firefighter's "regular salary or wages" must be included. Second, the municipality may explicitly agree that certain benefits should be included, even if the benefits are not "regular salary or wages" under section 207-a (2). In that case, a CBA must expressly provide that the benefits in question are to be included in the 207-a (2) supplement, as a CBA should

---

section 207-a (2) supplements, nor did it allow Yonkers to reduce or recoup any payments. These issues were properly submitted to arbitration (*see Matter of City of Yonkers v Yonkers Fire Fighters, Local 628, IAFF, AFL-CIO*, — NY3d — [2022] [decided today]). Supreme Court confirmed the arbitral award and Yonkers's appeal of that decision is now pending before the Appellate Division.

[3] Yonkers did not appeal Supreme Court's determination that its attempt to recoup past payments made to Retirees was arbitrary and capricious; therefore that issue is not before us.

not be interpreted to "implicitly expand whatever compensation rights are provided . . . under the statute" (*Chalachan*, 55 NY2d at 990). Here, the Retirees have pursued the first route, arguing that the special pays constitute "regular salary or wages."

"[R]egular salary or wages is calculated based on the current salary of an active firefighter at the same grade the pensioner held upon retirement" (*Matter of Farber v City of Utica*, 97 NY2d 476, 479 [2002]). As the court noted in *Phaneuf v City of Plattsburgh*, " 'salary' generally is meant to be a fixed compensation periodically paid to a person for regular work or services" (84 Misc 2d 70, 74 [Sup Ct, Clinton County 1974], *affd* 50 AD2d 614 [3d Dept 1975], *lv dismissed* 38 NY2d 1004 [1976]; *see also Chalachan*, 55 NY2d at 990 [citing *Phaneuf* approvingly]). In other words, 207-a (2) beneficiaries' supplements must be calculated based on the compensation they would be entitled to receive for the performance of regular job duties if they had stayed on as active-duty firefighters at the ranks they held at retirement (*cf. Chalachan*, 55 NY2d at 990; *see also Matter of McKay v Village of Endicott*, 161 AD3d 1340, 1343-1344 [3d Dept 2018], *lv denied* 32 NY3d 913 [2019]).

General Municipal Law § 207-a reflects New York's longstanding commitment to taking care of its firefighters. By the late-nineteenth century, Eastern cities began to establish paid fire departments to replace the volunteer associations that quelled midcentury century urban fires (*see* Amy S. Greenberg, Cause for Alarm: The Volunteer Fire Department in the Nineteenth-Century City 11-15 [1998]; Eric H. Monkonnen, America Becomes Urban: The Development of U.S. Cities & Towns, 1780-1980, at 106-107 [1988]). Many New York cities incentivized these professional firefighters with

"comprehensive and generous" pensions for disabilities incurred in the line of duty.  Some New York cities granted pensions of up to one-half of their yearly compensation to firefighters totally and permanently disabled in the performance of the duties (*see* John Kenlon, Fires and Fire-Fighters 259 [1913]; *see also e.g.* L 1926, ch 677; Letter from John Boyd Thacher II, Mayor of City of Albany, Bill Jacket, L 1938, ch 562 at 7; Letter from Harold W. Baker, City Manager of City of Rochester, Bill Jacket, L 1938, ch 562 at 10).

Not all cities were so generous, however.  In 1938, the New York legislature responded by passing a law to provide "for the payment of the compensation" and medical expenses of firefighters, under which certain municipalities with paid fire departments were required to pay disabled firefighters "the full amount of [their] regular salary or wages" as well as "all medical treatment and hospital care furnished during such disabilit[ies]" until their disabilities ceased (L 1938, ch 562, § 1, codified as amended at General Municipal Law § 207-a [1]).  When interpreting the language of the resulting statute, we have therefore recognized that "section 207-a of the General Municipal Law is a remedial statute enacted for the benefit of fire[fighters]" and have therefore "liberally construed [it] in their favor," (*Matter of Mashnouk v Miles*, 55 NY2d 80, 88 [1982] [brackets omitted], quoting *Pease v Colucci*, 59 AD2d 233, 235 [4th Dept 1977]).

When the legislature enacted General Municipal Law § 207-a (2) in 1977, it did not alter the statutory language or remedial purpose underlying the "regular salary or wages" provision and understood that its language would cover the kind of compensation sought by the Retirees.  By the 1970s, many New York municipalities complained that the statutory requirements were "excessively costly and undesirable" (Governor's Approval

Mem at 1, Bill Jacket, L 1977, ch 965). As the Permanent Commission on Public Employee

Pension and Retirement Systems explained, "The law require[d] the employer to pay a

disabled fireman full salary . . . [as well as] any merit salary increments and all other fringe

benefits . . . which have been granted to able firemen in his grade" (Rep of Permanent

Commn on Pub Empl Pension & Retirement Sys at 1-2, Bill Jacket, L 1977, ch 965; *see*

*also* Letter from St Ins Dept, Aug. 4, 1977, Bill Jacket, L 1977, ch 965). In response, the

legislature shifted much of the burden onto state pension systems and away from municipal

payrolls (*see* Governor's Approval Mem at 1, Bill Jacket, L 1977, ch 965). It did not,

however, change the amount of payment, which was governed by the familiar "regular

salary or wages" text (*see Mashnouk*, 55 NY2d at 87). Regular salary or wages remained

broader than simple base salary. Recognizing that fact, we observed in *Mashnouk* that the

legislature did not intend to limit "regular salary or wages" simply because it explicitly

entitled light duty firefighters to "regular salary or wages, including increases thereof and

fringe benefits" in General Municipal Law § 207-a (3) (*id.* at 86).[4]

The dissent interprets "regular salary or wages" differently than the enacting

legislature did. It argues that regular salary or wages only includes " 'regular,' 'base' or

---

[4] The dissent characterizes the 1977 amendment as evincing an "intent to reduce, to the extent possible, the financial burden for disability payments placed on municipalities" (dissenting op at 11, citing *Farber*, 97 NY2d at 479). The 1977 amendment did not intend to reduce the burden for municipalities as far as possible. As the dissent admits, the law kept beneficiary pay constant, and reduced the burden on municipalities only by "shift[ing] the source of [some of] the payments, not the amount" (dissenting op at 2). Recognizing that the law did not reduce the burden as far as possible, we noted in *Farber* that "[t]he 1977 amendment . . . only partially relieved municipalities of their burden" (97 NY2d at 479).

'annual' salary as defined in the CBA" along with several other types of payments previously recognized by our doctrine (dissenting op at 5). The dissent's approach, which seemingly looks solely to the placement of labels and headings in a CBA, would allow municipalities and unions to advantage current active firefighters at the expense of retirees disabled in the line of duty—something the statute was originally designed to prevent.[5] A CBA can reduce the financial burden of General Municipal Law § 207-a (2) by shifting compensation away from fixed pay and towards variable compensation.[6] But it may not pretend to do so merely by adjusting the labels in its CBA.

---

[5] The dissent's reasoning as to the 12-minute check-in pay, if extended near its logical end, would allow a CBA to evade the statute by providing for a one-hour workday for which firefighters were required to check in 8 hours in advance, and further providing for 8 hours of check-in pay for those firefighters who "check in" 8 hours before their shifts. Under the dissent's theory—even when a CBA clearly states that all firefighters must check in 8 hours in advance and that all are entitled to receive the 8-hour check-in pay regardless of whether they do so—disabled retirees should not receive this "check-in pay" because the CBA does not label it as "regular salary," "base salary," or "annual salary."

The dissent responds that active members can be trusted to represent the interests of current and future retirees because of their own concern of being injured themselves. Were that so, General Municipal Law § 207-a would be unnecessary. To the contrary, "the risk cannot be overlooked that union representatives on occasion might see fit to bargain for improved wages or other conditions favoring active employees at the expense of retirees' benefits" (*Chemical Workers v Pittsburgh Plate Glass Co.*, 404 US 157, 173 [1971]). General Municipal Law § 207-a (2) addresses the problem of imperfectly aligned incentives by tying the compensation of beneficiaries to active-duty firefighters. As the dissent observes, the legislature's solution does not ensure that the incentives of the two groups are perfectly aligned (*see* dissenting op at 6 n 6), but that solution is not as readily manipulable as the dissent's proposal to rely on labels in a CBA.

[6] The dissent expresses concern about the fiscal challenges Yonkers faces as a result of our decision (*see* dissenting op at 1, 11). Our opinion does not forbid Yonkers (or any other municipality) from renegotiating its CBAs with its employees, tactics municipalities regularly employ to manage budgetary shortfalls. What the legislature has prohibited

The sparse caselaw the dissent cites does not support its position. *Farber* interpreted the "amounts received" provision of General Municipal Law § 207-a (2), noting in *dicta* that a retired firefighter's "salary or wages" was "based on the current salary of an active firefighter at the same grade the pensioner held upon retirement" and gave no indication that "salary" was exclusively defined as the compensation the parties called "base salary" (97 NY2d at 479). *Mashnouk* is even worse for the dissent, as it explicitly construed "salary or wages" to include salary increases (*see* 55 NY2d at 86). Moreover, the dissent cannot square its approach with the Appellate Division cases it cites requiring the inclusion of "longevity pay" in regular salary or wages. Such pay is included because "longevity pay constitutes 'regular salary or wages' " under section 207-a (2) (*Matter of Aitken v City of Mount Vernon*, 200 AD2d 667, 668 [2d Dept 1994]). This is so regardless of how a CBA might label longevity pay, or indeed, any other compensation.

*McKay* is inconsistent with the dissent's interpretation of our case law. Although the dissent attributes significance to the fact that the Yonkers CBA lists the special pays under a separate heading from "annual salary" (dissenting op at 7), the CBA in *McKay* did the same thing. The *McKay* CBA listed "salaries" in Section 8; nevertheless, the court included the schedule adjustment (Section 9) and the EMS pay (Section 34) in its award (*see* 161 AD3d at 1341-1344). The dissent attempts to avoid the section heading problem by reading the *McKay* CBA's language that the pays would be "added to . . . base salary"

---

Yonkers from doing is targeting its disabled firefighters by treating them differently than it does its active-duty firefighters.

to mean that these provisions were "included in a participant's base salary, rather than treated as a separate, additional benefit" (dissenting op at 5, quoting *McKay*, 161 AD3d at 1342). The plain text of the *McKay* CBA, however, expressly distinguished "Base Pay" from "schedule adjustment." Thus, the petitioner recovered the schedule adjustment not because of the text of the CBA, but because "[p]etitioner, like all other firefighters on active duty, was receiving the adjustment when he retired, and an active firefighter currently employed at petitioner's rank would likewise receive the adjustment" (161 AD3d at 1344). We apply the same approach in the present case.

## II.

Under the CBAs, the Retirees would have been legally entitled to the holiday pay and the check-in pay for performing their regular job duties. Consequently, those pays are part of the "regular salary or wages" to which they are entitled by General Municipal Law § 207-a (2). By contrast, the Retirees have not established that they would be legally entitled to the night differential for performing their regular job duties. The night differential is therefore not included under their "regular salary or wages" (General Municipal Law § 207-a [2]).

It is clear from the CBAs that all firefighters are entitled to receive holiday pay and check-in pay based solely on the performance of regular job duties. The provisions of the CBAs governing check-in pay require that firefighters be present for duty 12 minutes prior to the commencement of their tours of duty to receive instruction, equipment, and for other miscellaneous duties. They specify, without qualification, that each employee "shall receive an additional [5½] days [of pay]" per year. The provisions governing holiday pay

provide that firefighters shall be paid for 12 holidays, "*whether worked or not*" (emphasis added). Hence, all active-duty firefighters performing their regular job duties are contractually entitled to receive both check-in pay and holiday pay.[7]

Including holiday and check-in pay does not pose the risk of unfairness we cautioned against in *Chalachan*. There, we noted that it would not be appropriate to "imply a right to vacation benefits under section 207-a because disabled fire[fighters] do not have to work at all, and to pay them for unused vacation time would unfairly discriminate against employees actually working" (55 NY2d at 990). The scope of regular salary or wages and the fairness inquiry are two sides of the same coin: If compensation is provided in exchange for the performance of an employee's regular job duties, it would not be unfair to provide that payment to a disabled firefighter because, but for their injury, they would be entitled to receive that compensation.[8] Conversely, if compensation is paid for some

___

[7] The difference in our reasoning with respect to holiday pay and check-in pay is not inconsistent (*see* dissenting op at 6 n 6, 10). For compensation to be salary, it must be paid in exchange for the performance of regular job duties. In the case of holiday pay, the "whether worked or not" language in the CBAs demonstrates that all firefighters who perform their regular duty as firefighters are entitled to receive holiday pay. In the case of check-in pay, because all firefighters are required to check in, it is unnecessary—and would in fact be confusingly inappropriate to say—"whether checked in or not." The requirement to check in 12 minutes before a shift applies to all firefighters, and renders the check-in pay part of their compensation for their regular duties; the lack of any qualification on the pay provides no reason to believe otherwise. The fact that the CBAs explicitly mention that not all firefighters are entitled to receive night pay (only those who actually work at least one night a cycle, with no clear contractual requirement that all firefighters do so) explains why our determination for night pay differs from the other two cases.

[8] The dissent contends that the unfairness analysis is a separate inquiry to be conducted *after* we have classified a payment as "regular salary or wages" (dissenting op at 10-11). That approach does not comport with the text of General Municipal Law § 207-a (2), which

additional or different duty beyond regular job duties or contingent on a certain scenario arising, it would be unfair to provide such a benefit to disabled firefighters because it is uncertain whether they would otherwise be entitled to this compensation.[9]

Here, holiday pay does not raise fairness concerns because the CBAs provide that firefighters will be paid for the holidays "whether [they] worked [on a holiday] or not." Likewise, all firefighters are required to check in 12 minutes before their shift begins, and are automatically entitled to receive check-in pay. Therefore, "because all active firefighters . . . receive the adjustment[s], this determination does not 'unfairly discriminate against employees actually working' " (*Matter of McKay*, 161 AD3d at 1344, quoting *Benson v County of Nassau*, 137 AD2d 642, 643-644 [2d Dept 1988], quoting *Chalachan*, 55 NY2d at 990), awarding the holiday and check-in pay to the Retirees fulfills the statutory purpose of placing them at parity with current firefighters holding the same rank.

---

does not mention fairness at all. If a payment is first classified as "regular salary or wages" under the statute, there would be no need thereafter to consider fairness, because the statute would require it be treated as such. Instead, the fairness inquiry helps determine whether the payment in question is part of a firefighter's regular salary or wages.

[9] Thus, typically, benefits such as compensation for unused vacation time and sick leave are not part of regular salary or wages because receipt of those benefits depends on whether an employee actually takes sick leave or uses vacation time (*see Chalachan*, at 990; *Phaneuf*, 84 Misc 2d at 74-75). Similarly, "holiday pay" that, pursuant to a CBA different from the Yonkers CBA, constitutes "additional compensation for [only] those firefighters who are actually required to work holidays" will not normally be included in "regular salary or wages" (*see* 34 Ops St Comp No. 78-842, at 170 [1978]; *see also Matter of Binghamton Firefighters, Local 729, Intl. Assn of Firefighters v City of Binghamton*, 56 NY2d 731, 733 [1982], *affg* 85 AD2d 836 [3d Dept 1981]).

Unlike check-in and holiday pay, the Retirees have not established whether all firefighters are contractually entitled to receive night differential pay.[10] Night differential contains two express conditions: it is earned only by "firefighters who are regularly scheduled to work rotating tours that include the 6:00 p.m. to 8:00 a.m. night tour, and only to firefighters actually working that night tour." The restriction of this payment to those firefighters who "actually work[] the night tour" strongly suggests that night differential must be specially earned, not paid to all, rendering it distinct from "regular salary or wages," and the Retirees have not demonstrated that the CBAs require all firefighters to work the night tour. Thus, the Retirees have not demonstrated that all firefighters are entitled to earn the night differential such that it should be included in the section 207-a (2) calculation.

## III.

Because the CBAs plainly entitle all active-duty firefighters to holiday and check-in pay, Yonkers's determination that these did not constitute "regular salary or wages" under General Municipal Law § 207-a (2) was based on an error of law. Given that the CBAs provide night differential only to those who work nights and petitioners have not established that all firefighters are contractually obligated to work nights, substantial evidence supports Yonkers's conclusion that night differential should not be included when calculating the supplement.

---

[10] The arbitration award pertained only to firefighters who, unlike the Retirees, were employed by Yonkers on or after December 9, 2015, and concerned a provision of the Local 628 CBA not raised in this appeal (*see supra* n 2).

Accordingly, the order of the Appellate Division insofar as appealed from should be modified, without costs, in accordance with this opinion and, as so modified, affirmed.

GARCIA, J. (dissenting):

All four factfinders and decisionmakers in this case, applying our precedent, concluded that the "special pays" at issue here were not "regular salary or wages" pursuant to General Municipal Law § 207-a. In reversing, the majority redefines that statutory term to mean "monetary compensation to which current employees are contractually entitled based on the performance of their regular job duties." This new rule is found nowhere in our precedent, will drain municipal budgets, and is unworkable for future cases. I dissent.

There is no dispute that the Retirees here suffered injuries while serving as firefighters and that General Municipal Law § 207-a provides for these Retirees to receive an award totaling the equivalent of their regular salary or wages when serving as active firefighters in compensation. When a permanently disabled firefighter is granted an accidental disability retirement allowance under Retirement and Social Security Law § 363, payments made pursuant to General Municipal Law § 207-a (1) cease but "such firefighter shall continue to receive from the municipality or fire district . . . the difference between the amounts received under such allowance or pension and the amount of his or her regular salary or wages" (General Municipal Law § 207-a [2]). As this Court explained, the "offset" for the disability retirement allowance was enacted "to 'substantially reduce the financial burden of municipalities with respect to payments to disabled fire[fighers] and . . . allow funds presently used for such payments to be used to hire able fire[fighters] and thereby increase the level of fire protection in municipalities throughout the State' " (*Matter of Farber v City of Utica*, 97 NY2d 476, 479, 481 [2002], quoting Governor's Mem. approving L 1977, ch 965, at 2543]).[1] The law sought to shift the source of payments, not the amount (*see Matter of Mashnouk v Miles*, 55 NY2d 80, 87 [1982]). The definition of "regular salary or wages"—which in turn determines the amount paid by the

---

[1] The majority insists that *Farber* does not say that the 1977 amendment was intended "to reduce the burden for municipalities as far as possible" (majority op at 6 n 4). It is beyond dispute, as we explained in *Farber*, that making the municipality liable only for the difference between the retirement allowance and "regular salary or wages" meant reducing the financial burden on the municipality to that *extent*. Of course, by redefining "regular salary and wages" so broadly, the majority significantly increases the amount owed by the municipality.

municipality—remained unchanged. A proper interpretation of this statutory term is critical; any unwarranted expansion of the definition undermines the goals of the legislation, forcing municipalities to spend more on disability payments and less on active fire protection.[2]

Where a "collective bargaining agreement . . . is entirely silent regarding the status of disabled fire[fighters] as employees of the city[,] [t]heir continued status as employees even after disability has occurred is strictly a matter of statutory right" and "[t]he collective bargaining agreement should not therefore be construed to implicitly expand whatever compensation rights are provided petitioners under the statute" (*Matter of Chalachan v City of Binghamton*, 55 NY2d 989, 990 [1982]). We have previously explained that, for purposes of determining General Municipal Law § 207-a (2) payments, "the amount of a pensioner's regular salary or wages is calculated based on the current salary of an active firefighter at the same grade the pensioner held upon retirement" (*Farber*, 97 NY2d at 479). That term includes "prospective salary increase[s] given to active fire fighters subsequent to the award of an accidental disability retirement allowance or pension"

---

[2] The majority's cavalier assurance that municipalities will be able to "renegotiat[e]" CBAs to "manage budgetary shortfalls" (majority op at 7 n 6) is cold comfort given the expanded liability imposed on many of those municipalities by today's holding. Moreover, unions may reject proposals to renegotiate (*see Matter of Civil Servs. Empls. Assn., v New York State Publ. Empl. Relations Bd.*, 207 AD2d 589, 590 [3d Dept 1994] [rejection of County proposal to renegotiate CBA despite fiscal crisis, leading to County's unilateral implementation of unpaid furloughs]). One thing we do agree on: the need for such measures is now likely to increase.

(*Mashnouk*, 55 NY2d at 88) [3] and, before today, excluded holiday pay (*see Matter of Binghamton Firefighters, Local 729 v City of Binghamton*, 56 NY2d 731, 733 [1982], *affg* 85 AD2d 836 [3d Dept 1981] [holding that disabled firefighters were not entitled to holiday pay where the CBA "provisions . . . are not substantially different from those at issue in" *Chalachan* and the same "public policy considerations referred to in the *Chalachan* case apply equally here"]).[4]　The Appellate Division Departments have held that the term includes salary decreases received by active firefighters of the same rank (*Matter of Whitted v City of Newburgh*, 126 AD3d 910, 911 [2d Dept 2015]) and longevity pay (*Matter of Aitken v City of Mount Vernon*, 200 AD2d 667, 668 [2d Dept 1994] [in part relying on NYC Comptroller opinion concluding that General Municipal Law § 207-a (2) recipients are entitled to longevity salary increments]), as well as additional categories of pay that the CBA provides may be "added to [the participating firefighter's] base salary" (*Matter of McKay v Village of Endicott*, 161 AD3d 1340, 1342 [3d Dept 2018] ["the plain language of the contract (adding the disputed payment categories to base pay) thus

---

[3] In *Mashnouk*, the Court noted that prior to the amendment providing for the offset, "the term 'regular salary or wages' had already been interpreted by the courts to include subsequent salary increases," which were at issue in that case (55 NY2d at 88).　In other words, the amendment did not change or limit the prior definition of "regular salary or wages;" it merely shifted the source of—and therefore some of the financial responsibility for—the payment.　By the same token, the amendment, aimed at providing certain financial relief to municipalities, certainly did not expand that definition of regular salary and wages, as the majority does today.

[4] Although the majority holds the opposite today with respect to holiday pay, there is no mention, let alone any attempt to distinguish, our precedent holding otherwise—save for a *see also* citation to *Binghamton Firefighters* following a citation to a 1978 Comptroller's Opinion that predated the case.　The majority's disregard of our precedent with respect to holiday pay also calls the precedential value of *Chalachan* into question.

contemplates that (these categories of pay are) included in a participant's base salary, rather than treated as a separate, additional benefit"]).[5]   Courts had no difficulty understanding that a "salary increase" was part of "regular salary," while "holiday pay" was not (*but see* majority op at 8 [professing confusion as to how "longevity pay" constitutes part of a regular salary when not specifically included as such in the CBA]).

Our precedent is clear: when assessing entitlement to General Municipal Law § 207-a benefits pursuant to a CBA that is silent with respect to the rights of disabled firefighters, we do not look simply to the total compensation or funds received by an active firefighter of the same rank as the Retiree but must determine what part of that compensation constitutes "regular salary or wages."  And "regular salary or wages" means exactly that: "regular," "base," or "annual" salary as defined in the CBA.  The majority elides this distinction, reasoning that "207-a (2) beneficiaries' supplements must be calculated based on the compensation they would be receiving for the performance of regular job duties if they had stayed on as active-duty firefighters at the ranks they held at retirement" (majority op at 4).  None of the cases cited support this conflation between "regular salary and wages" and "compensation . . . receiv[ed] for the performance of regular job duties" (*id.*).  Whether items of compensation are provided to active firefighters "based on the performance of

---

[5] The majority selectively reads *McKay* and ignores that court's analysis of the relevant CBA.  The majority's assertion that the categories of pay in *McKay* were not recovered "because of the text of the CBA" is misleading in light of *McKay*'s language, quoted above, that "[t]he plain language of the contract thus contemplates that EMS pay is included in a participant's base salary, rather than treated as a separate, additional benefit" (161 AD3d at 1342, 1344).  The majority's attempt to distort the *McKay* holding in an effort to support its new rule is particularly confounding in light of that case's lack of precedential value.

their regular job duties" is not the relevant question—what is relevant is their regular salary or wages pursuant to the language of the CBA.[6]

Two CBAs apply here—that for the Uniformed Fire Officers Association (UFOA) and Local 628. Both CBAs contain an Article 4:0, titled "Compensation." Section 4:01 of Article 4:0 of the UFOA CBA, entitled "Annual Salary," includes base salary and provides the calculations necessary for determining base salary and longevity pay. Subsequent sections explain the circumstances under which firefighters shall receive arson pay, check-in pay, holiday pay, night differential, and educational incentive pay, as well as the timing of these payments: for check-in pay, "on a semi-annual basis, in January and July," for holiday pay, in two installments, in June and December, and for night differential, in two installments, in February and August. Section 4:01 of the Local 628 CBA, entitled "Annual Salary," includes base salary, longevity pay, and arson pay; section 4:02 explains the rate of pay; and section 4:03 addresses overtime and overtime pay, minimum recall pay, night differential, check-in pay, and holiday pay.

---

[6] The majority's assertion that my approach "would allow municipalities and unions to advantage current active firefighters at the expense of retirees disabled in the line of duty" (majority op at 7, 7 n 5) contains several flaws. First, it is unclear how the majority's approach would resolve the hypothetical problem, as it both requires explicit language showing that all active firefighters receive such benefits (with respect to holiday pay and night differential) and does not require such express language (for check-in pay)—which could easily be manipulated in the same manner. And it presumes that active members of a Union consider themselves impervious to injury when, in fact, active firefighters have an obvious interest in negotiating for benefits they would receive in the event they become disabled in the line of duty.

Although the decisions by the hearing officers and courts below applying our well-settled approach to this issue receive no consideration from the majority, all examined the specific provisions of the relevant CBAs and concluded that night differential, check-in pay, and holiday pay—the "special pays" at issue here—are not part of a firefighter's regular salary or wages. The two Yonkers-appointed hearing officers who held the due process hearings through which the Retirees first challenged Yonkers's determination to exclude special pays analyzed both CBAs and issued reports and recommendations with their findings. Hearing Officer Bernstein determined that "[a] plain reading of the relevant provisions of the parties' collective bargaining agreements refutes Respondent's contention that night differential pay, check-in pay and holiday pay are contractually mandated components of his 'regular salary and wages.' " He explained that "[t]he agreements between the City and its respective bargaining units specifically define 'annual salary' " and "[i]n both agreements check-in pay, holiday pay and night differential pay are contained in distinctly separate provisions and are excluded from the provision defining 'annual salary,' " and "[i]nstead, check-in pay, holiday pay and night differential pay are described in separate provisions along with 'overtime pay' and 'minimum recall pay' in the agreement with Local 628 and 'arson pay' and 'educational incentive pay' in the agreement with the UFOA." Accordingly, Hearing Officer Bernstein found that it was not arbitrary and capricious for Yonkers "to recalculate the Respondent's General Municipal Law § 207-a (2) benefit."

Hearing Officer Ponzini determined similarly that "[t]he collective bargaining agreements here define the rate of pay for active members as 'annual base salary' plus 'longevity' and do not include fringe benefits in that definition," explaining that "[w]hile the CBAs provide check-in pay, night differential and holiday pay to those on active duty, those additional benefits are addressed in provisions that are distinct from the provisions defining annual salary."  Since "[n]either agreement addresses the payment of such fringe benefits to retirees" and "the CBAs here are silent with respect to this issue, they cannot provide a contractual predicate for expanding the statutory benefit" and "[a]ccordingly, [inclusion of the special pay categories in General Municipal Law § 207-a payments] was not authorized by statute nor by the collective bargaining agreement."  The City adopted these reports and recommendations, and the Retirees filed an article 78 petition alleging that the determination to reduce the categories of special pay from the Retirees' General Municipal Law § 207-a payments was arbitrary and capricious and lacked a rational basis.

In dismissing the article 78 petition, Supreme Court held that "the decision was not arbitrary or capricious" because the City's determination "relied on the findings of both hearing officers, who, in turn, relied heavily upon the Second Department and Court of Appeals cases that distinguish between 'regular salary and wages' and 'fringe benefits.' " The Appellate Division affirmed, holding that, in light of this relevant precedent to the contrary, "petitioners did not sustain their burden of establishing their entitlement to compensation for night differential, check-in pay, and holiday pay as part of their disability

benefits under the language of" General Municipal Law § 207-a (2) (187 AD3d 897, 899 [2d Dept 2020]).  I agree.

The majority disagrees and, in reversing here, promulgates a radical new approach reading "regular salary and wages" out of the statutory text and substituting "monetary compensation" and, sporadically, "regular job duties."  As a result, courts must now look to whether each item of compensation is provided to all active firefighters.  The governing standard is variously expressed as whether the CBA: (1) "strongly suggests" the payment must be earned; (2) makes clear that "all firefighters are entitled to receive holiday pay and check-in pay based solely on the performance of regular job duties"; or (3) makes clear that any active firefighter is "legally entitled" to the special pays (majority op at 9, 12).  Or, put another way, the majority's new "monetary compensation" rule is "everyone gets everything everyone else always gets."  However articulated, the test is wrong.

While the majority implies that its analysis is grounded in the statutory language, consideration of the parties' stipulated practices is woven through their reasoning—their analysis demands nothing more than an examination of what active firefighters obtain for "regular job duties" (majority op at 2, 4, 9, 10, 10 n 7, 11).  Even at that level, the majority's reasoning is inconsistently applied.  The majority contends that "it is clear from the CBAs that all firefighters are entitled to receive holiday pay and check-in pay based solely on the performance of regular job duties" (majority op at 9).  In fact, the CBA provides that, for check-in pay, "[m]embers shall be present at their assigned commands for duty twelve (12) minutes prior to the start of their tour of duty for receipt of officer instructions, notice of

pertinent alarms, roll call, training, equipment and/or uniform inspection." The majority's assumption that those firefighters who are not present at that assigned time continue to receive check-in pay stems from reliance on the parties' stipulation that is beyond the four corners of the CBA. Moreover, with respect to holiday pay, the majority relies heavily on the CBA's inclusion of language providing that "firefighters 'shall be paid for [12] legal holidays, *whether worked or not*' " (majority op at 10 [emphasis in majority]). The lack of corresponding language for check-in pay somehow has no similar effect on the analysis. In addition, the majority fails to grapple with our precedent excluding holiday pay from the statutory term "regular salary or wages" for the same reasons unused vacation time was excluded in *Chalachan* (*see Binghamton Firefighters*, 56 NY2d at 733). And with respect to night differential pay, the majority—correctly—ignores the stipulation by the parties that all active firefighters receive that compensation, and relies on the CBA's "restriction of this payment to those firefighters who 'actually work[] the night tour' " in order to exclude night differential from regular salary or wages (majority op at 12). The majority's convoluted explanation for when such language should be required to prove that a category of compensation is part of the "performance of their regular job duties" (as with night differential) and when it should not (as with check-in pay) only highlights the inconsistency (majority op at 10 n 7).

Lastly, the majority makes much of the fact that awarding "holiday and check-in pay [to the Retirees] does not pose the risk of unfairness we cautioned against in *Chalachan*" (majority op at 10). But that concern was expressed with respect to

"imply[ing] a right to [certain] benefits under section 207-a" when that statute is "expressly limited to 'regular salary and wages' " (*Chalachan*, 55 NY2d at 990). It was not used, as the majority does here, to justify classifying a "special pay" as such.

In the past, we have ensured that our interpretation of the language of General Municipal Law § 207-a comports with the legislature's intent to reduce, to the extent possible, the financial burden for disability payments placed on municipalities and thereby " 'increase the level of fire protection' " (*Farber*, 97 NY2d at 479). Mindful of the legislature's intent as well as of the needs of disabled firefighters, we could take comfort in the fact that, in the event a municipality such as Yonkers decided that disabled firefighters should receive these categories of special pay, they may, as the Second Department acknowledged, "agree in a collective bargaining agreement to include such additional amounts in the regular salary or wages payable to disabled firefighters pursuant to" General Municipal Law § 207-a (187 AD3d at 899). That approach ends today. Tapping other funding sources for active fire protection may be difficult. Yonkers has faced serious budget deficits, including a Public School District budget gap of at least $7.4 million in its proposed budget for fiscal year 2022-2023 (State Comptroller's Review of Yonkers Proposed City Budget for 2022-23 Fiscal Year, dated May 16, 2022, available at https://www.osc.state.ny.us/files/local-government/audits/2022/pdf/yonkers-budget-review-B22-6-5.pdf [last accessed Nov. 29, 2022]). Today's change in the law will have very real consequences for Yonkers residents and for municipalities statewide facing similar fiscal challenges.

Order insofar as appealed from modified, without costs, in accordance with the opinion herein and, as so modified, affirmed. Opinion by Judge Wilson. Judges Rivera, Singas and Troutman concur. Judge Garcia dissents and votes to affirm in an opinion, in which Acting Chief Judge Cannataro concurs.

Decided December 15, 2022